IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN REMUS,

    Plaintiff,

  v.

FIOS, INC., ET. AL.,

    Defendants.

                                 /

No. C 11-01264 CRB

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff John Remus ("Remus") worked for Fios, Inc. as a sales representative, selling the company's electronic discovery services to corporate and law firm clients. Remus has now sued his former employer, several unnamed Does ("Fios" or "Defendant"), alleging that Fios removed him from a lucrative account after he had secured it, lowered his commission rate, and then terminated him in retaliation for complaining about the above conduct. He specifically alleges claims of: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) wrongful termination in violation of public policy. Fios moves for summary judgment on all claims. Since Defendant did not breach Plaintiff's employment contract or the covenant of good faith and fair dealing, and the termination was not in violation of public policy, the Court GRANTS the motion for summary judgment on all claims.

## I.     FACTUAL BACKGROUND

Defendant provides electronic discovery services to corporations and law firms. Terry Decl. (dkt. 28-2) ¶ 1. In particular, Defendant provides electronic document processing, review support, and production services requested by their clients. Id. Defendant states employees work in a wide range of positions including developing business and selling Fios's services along with providing day-to-day project management and coordination for clients. Id.

Plaintiff was employed by Defendant from March 2008 until he was terminated on October 5, 2010. Remus Decl. (dkt. 32) ¶ 1; Terry Decl. ¶ 4. Plaintiff worked as an account executive covering the northwestern portion of the United States. Id. Plaintiff was initially hired to spend the majority of his time pursuing potential corporate, or enterprise clients, but was later directed to focus his sales on gaining potential new business from law firms. Cogbill Decl. (dkt. 28-1) Ex. A ("Remus Depo.") at 18:1-10. Plaintiff was hired as an at-will employee, and remained an at-will employee throughout his employment. Remus Depo. at 19:6-8, Ex. 1. As set forth in his offer letter, "Fios management reserve[d] the right to change or alter the terms of the Company policies, compensation plan and sales territories at any time." Id. Plaintiff acknowledged and accepted his employment with Defendant under these terms. Remus Depo. at 19:6-8, Ex. 1.

Plaintiff's compensation was partially a set salary and partially a commission based on a percentage of revenue received by Defendant from clients who had contracted for e-discovery services as a result of Plaintiff's sales efforts. The company's Sales Compensation Plan ("Compensation Plan") governed Plaintiff's commissions. Remus Depo. Ex. 1. Generally, a Compensation Plan set forth an individual's target quotas for a designated time period and the percentage at which commissions would be calculated based upon the individual's success in meeting his quotas. Remus Depo. at 22:13-24. The lowest commission percentage prior to Plaintiff's final Compensation Plan was five percent. McBride Decl. Ex. 1.

Under the sales guidelines, Plaintiff earned a commission upon collection of revenue from the client. Remus Depo. at 25:15-27:13. In practice, once a client was invoiced,

2

Plaintiff received a commission advance in the following month's regular payroll cycle. Id. The commission advance was subject to a later adjustment if there was a discrepancy between the amount invoiced and the amount received. Id. Thus, actual payment of a commission depended upon invoice and receipt of revenue rather than upon the booking or signing of a contract with a client. Id. at 28:5-9.

The first Compensation Plan applicable to Plaintiff was the 2008 Compensation Plan, effective March 17, 2008. Remus Depo. at 20:15-21:8, Ex. 2 ("2008 Plan"). The 2008 Plan set forth Plaintiff's annual quarterly quotas for the year, as well as the rate upon which he would earn a commission. The 2008 Plan stated it was subject to change by Fios Management: "Fios management reserves the right to change, modify and/or amend the terms of this compensation Plan. This plan does not imply a contract of employment and does not change the at-will status of the employee." Remus Depo. Ex. 2.

The Compensation Plans changed throughout Plaintiff's employment, including in February 2009, January 2010, and July 2010. Remus Depo. Exs. 4, 5, and 6. Plaintiff's Compensation Plan was first modified when he executed the 2009 Compensation Plan. Id. Ex. 4 ("2009 Plan"). The 2009 Plan again stated that "Fios management reserves the right to change, modify and/or amend the terms of this compensation plan." Id. Additionally, the 2009 Plan stated that no contract for employment was to be implied, nor was the at-will status of Plaintiff to change. Id. Defendant changed the plan again, issuing a new plan executed by Plaintiff on or about February 3, 2010. Remus Depo. at 32:21-33:3, Ex. 5 ("2010 Plan"). The 2010 Plan also stated Defendant reserved the right to change, modify and/or amend the terms of the Plan, and that it "does not change the at-will status of the employee." Remus Depo. Ex. 5.

In the spring of 2009, Defendant learned of a Request for Proposal ("RFP") from Intel. Remus Depo. at 41:7-11. Intel requested potential vendors respond to their proposal and submit a business plan for handling their e-discovery needs. Terry Decl. ¶ 3. This RFP would allow Defendant to become an approved vendor for future projects, rather than being selected to perform a specific project. Remus Depo. at 42:4-6; Terry Decl. ¶ 3.

Over the following year and a half, Plaintiff oversaw the sales effort with Intel. Remus Decl. ¶¶ 4-7. Initially, Defendant provided a written response to Intel's RFP, which was drafted by Allen Gurney, Director of Consulting, in collaboration with Plaintiff. Remus Depo. at 42:21-44:2. Plaintiff stated that he had "all final approval of what we were to submit. [He] read first and then gave [his] approval" of the RFP response. Id. at 43:9-10. Following the written submissions, Defendant moved to the next stage of the process – participating in a Proof of Concept ("POC"), or pilot program. Remus Depo. at 49:5-21. During the POC, Defendant conducted a mock project designed to test its ability to process, load, review, and produce electronic data. Id. at 50:10-51:2. During this time, Plaintiff remained the point of contact for Intel. Id. at 51:3-6. He stated he and the analyst team actually undertaking the project had twice-daily calls with Intel during the month-long POC. Id. at 51:19-52:2. On December 1, 2009, Plaintiff led a conference call among Defendant's executives and Intel representatives to discuss the results of the POC process. Id. at 52:11-53:18.

Defendant waited to hear whether it would become an approved Intel vendor for the next three to four months. Plaintiff made regular calls to his contact at Intel during this period to determine the status of their decision-making, and offer to answer any questions that arose. Remus Depo. at 54:16-56:23, 57:8-10, 57:18-25. Finally, on or about March 22, 2010, Plaintiff learned through a contact at Intel that Defendant had been selected as an approved vendor. Id. at 58:4-59:6.

After receiving word that it would be an approved vendor, Defendant began negotiating a contract with Intel. Id. at 59:22-60:2. The actual negotiations were handled by Mr. Terry and Chief Sales and Marketing Officer, John Leitner. Id. at 62:15-63:16, 64:18-21.[1] After a few initial phone calls to representatives at Intel, Plaintiff had no further contact

---

[1] Plaintiff states in his Declaration that Mr. Terry assured him that the Intel account was still his even though he was not involved in the actual contract negotiations. Remus Decl. ¶ 9. Defendant objects to the introduction of this statement by Mr. Terry on the grounds that it lacks foundation and is hearsay under F.R.E. 601, 602, 801, and 802. See Defendant's Objections to Remus Decl. (dkt. 40) at 2 (Objection #4). Plaintiff failed to file a response to Defendant's evidentiary objections, or address the issue at the hearing. Since it appears that Plaintiff offers the statement for the truth of the matter asserted, the statement is inadmissible hearsay. The Court SUSTAINS this Objection. Defendant makes ten objections to evidence presented by Plaintiff, which the Court will address as needed. As for any objection not mentioned specifically by the Court by number, the Court hereby OVERRULES the objections as moot.

4

with anyone at Intel, nor did he have any further involvement in negotiating the contract. Id. at 64:6-8.

On July 6, 2010, Mr. Terry contacted Plaintiff and advised him, according to Plaintiff for the first time,[2] that his job performance was poor, and therefore, he would be removed from the Intel account. Id. at 69:2-5. Mr. Terry stated Defendant believed the Intel account needed stronger representation than what it believed Plaintiff could provide. Terry Decl. ¶ 6. Plaintiff objected to these changes, indicating he felt they were unfair. Remus Depo. at 69, 71.

Defendant did enter into a formal contract with Intel, which was executed two days later, on July 8, 2010. Remus Depo. at 65:13-15; Terry Decl. ¶ 7. Under the terms of the contract, Defendant became a new approved vendor permitted to provide e-discovery services to Intel. Id. at 65:16-23. The signed contract did not guarantee any work for Defendant. Id. at 65:24-25. The amount of work Defendant would receive from Intel, if any, was dependent on Defendant's receipt of future projects and purchase orders; the first of which was not invoiced until August 31, 2010. Id. at 66:1-12, 66:19-67:7; Terry Decl. ¶ 7.

In July 2010, Defendant modified compensation plans for all of its sales employees – including Plaintiff – for the period of July 1, 2010 through December 31, 2010. Remus Depo. at 34:8-11. Plaintiff was first notified of the change by Mr. Leitner, who provided a general overview of the changes, but did not provide specifics of what the plan would look like going forward. Id. at 34:12-35:3, 38:6-39:3. When Mr. Terry notified Plaintiff that he would no longer be responsible for the Intel account on July 6, 2010, he also presented Plaintiff with the July-December 2010 Plan. Id. at 68:20-70:1. Defendant agreed to pay Plaintiff a commission of 1.62% for future revenue, if any, received from Intel, up to the first million dollars of Intel revenue. Id. at 69:14-70:1, Ex. 6. Prior to this point, Plaintiff had not

---

[2] Defendant also objects to the following statement in Plaintiff's Declaration: "On July 6, 2010 in a conversation with Michael Terry, I was advised by him for the first time that my performance had been unacceptable." Remus Decl. 3:6-7. See Defendant's Objections at 3 (Objection #5). Defendant objects on the grounds that statements by Michael Terry lack foundation and are hearsay pursuant to F.R.E. 601, 602, 801, 802. This statement again appears to be offered for the truth of the matter asserted – to imply that this was a pre-textual reason – and thus, would be hearsay. The Court SUSTAINS this objection.

5

received any commissions based on Defendant's relationship with Intel, as Intel had not yet ordered any services from Defendant. Id. at 40:14-41:2; 70:6-11. After being informed that he would be paid a 1.62% commission on future Intel revenue, Plaintiff acknowledged his consent and agreement to the July-December 2010 Plan by signing the Plan. Id. Ex. 6. From July 2010, through the end of his employment, Plaintiff worked under, and was paid sales commissions pursuant to, the July-December 2010 Compensation Plan. Id. at 40:9-11.

Defendant states Plaintiff had a documented history of poor performance prior to and separate from the Intel account. In June 2009, Mr. Terry was promoted to Director of Sales for the Western United States and became Plaintiff's immediate manager. Terry Decl. ¶ 4. For the six months preceding this transition, Plaintiff had only earned a collective total of $1,123.57 in commissions, which averages to less than 3.5% of his quota. Remus Depo. Ex. 11. Plaintiff earned no commissions during April, May, June, July or August 2009. Id. Once he was promoted, Mr. Terry began conducting field visits with his direct reports. Terry Decl. ¶ 5. At the time of his first field visit with Plaintiff, Plaintiff had been with Defendant for over a year. Id. During his field visits with Plaintiff, Mr. Terry states he noticed that Plaintiff was missing key sales opportunities and was not otherwise performing to the Company's expectations. Id. Mr. Terry states he proceeded to work with Plaintiff over the next year in order to provide coaching on both market and product knowledge. Id. Mr. Terry does not specifically state he told Plaintiff his performance was poor or unacceptable prior to July 6, 2010.

In the twelve months prior to his termination (October 2009 to October 2010), Plaintiff met his quota once (in November 2009), and exceeded 50% of his quota twice (in December 2009 and January 2010). Remus Depo. Ex. 11. The other 75% of the time, he did not meet 50% of his quota. Id. In five of his last six months with Defendant (April through October, 2010), Plaintiff did not achieve much better than 1/4 of his quota. Id.

In August and September, 2010 Mr. Terry observed that Plaintiff had become increasingly disinterested in work and appeared to otherwise have given up on making new sales of any kind. Terry Decl. ¶ 8. During a company-wide sales training in August, for example, Plaintiff failed to bring his laptop and other materials provided in advance of the

6

training. Id. In early September 2010, Mr. Terry confronted Plaintiff about his performance and apparent disinterest in work. Remus Depo. Ex. 8. In response, Plaintiff attributed his poor performance to Defendant's decision in July 2010 to set his commission percentage at 1.62% on the Intel account. Remus Depo. Ex. 9. Plaintiff believed the Intel account was his and he should have remained at a 5% commission percentage. See id. Plaintiff's employment was terminated on October 5, 2010. During this same time period, two additional employees were also terminated for poor sales performance. Terry Decl. ¶ 9.

Plaintiff filed suit in Superior Court in Santa Clara County, and Defendant removed the case to this Court. Dkt. 1. Defendant then filed a Motion for Summary Judgment on all of Plaintiff's claims. Dkt. 28. The Court held a hearing on the motion on February 24, 2012.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden is on the moving party to demonstrate that there is no genuine dispute with respect to any material fact and that it is entitled to judgment as a matter of law. Id. at 323. A genuine issue of fact is one that could reasonably be resolved in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "material" only if it could affect the outcome of the suit under the governing law. Id. at 248-49.

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000). If, on the other hand, the moving party has satisfied its initial burden of production, then the nonmoving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. Id. at 1103. The nonmoving party must "set forth specific facts

showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 322 n.2 (quoting Fed. R. Civ. P. 56). If the nonmoving party fails to make this showing, the moving party is entitled to judgment as a matter of law. Id. at 323.

When the moving party does not bear the burden of proof on an issue at trial, the moving party may produce evidence negating an essential element of the nonmoving party's case, and if the moving party produces such evidence, the burden shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Nissan Fire & Marine Ins. Co., Ltd., 210 F.3d at 1105-06.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255. However, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted). Rather, a court is entitled to rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment. See id.

## III. DISCUSSION

Defendant argues there is no issue of material fact on any of Plaintiff's claims, and that the Court should grant summary judgment in its favor on all claims. The Court will examine each claim in turn.

### A. Breach of Contract Claim

Plaintiff alleges Defendant breached his employment contract when it changed "plaintiff's commission plan reducing the percentage of commission he would be paid on the Intel account to 1.62% and limited to one million dollars the credit [he] would receive against his yearly quota." Compl. ¶ 6. This change occurred when the 2010 Plan was modified in July 2010 and replaced with the July-December 2010 Plan. Defendant argues that since the 2010 Plan specifically provided that Defendant "reserve[ed] the right to change, modify and/or amend the terms" of the 2010 Plan, Remus Depo. Ex. 5, exercising this right cannot be a breach of the contract. Moreover, Plaintiff stated he understood the Plan allowed Defendant to make modifications, and that no one represented to him his commission on Intel would always be five percent. Remus Depo. at 72:23-73:8. Finally, Plaintiff signed the

8

new July-December 2010 Plan and continued to work and receive compensation pursuant to that Plan until he was terminated. Id. at 40:9-11, Ex. 6.

Defendant argues that since it acted within the plain language of the contract, it cannot be liable for breach of contract. See Schuman v. IKON Office Solutions, Inc., No. 03-4976, 2005 U.S. Dist. LEXIS 10039, at *17-19 (N.D. Cal. 2005), aff'd 2007 U.S. App. LEXIS 11125 (9th Cir. 2007). Schuman is similar to the facts presented here – the plaintiff was involved in securing a contract for his employer to become a preferred vendor of a client. Id. at *5. The employer then removed the plaintiff from the client's account. Id. The applicable compensation plan specifically provided that defendant had the right to "change, cancel, expand or reduce the size, scope, and type of any territory assignments [to plaintiff] at any time for any reason." Id. at *16. The court held that the defendant did not breach the plan by removing plaintiff from the account because the plan authorized such a discretionary decision. Id. at *18. The same reasoning applies here.

Plaintiff argues Schuman does not apply because "presumably the [plaintiff] had continuing functions to perform." Opp'n at 7. Plaintiff argues that here there was nothing more he needed to do to earn his commission. Id. This does not appear to be a real distinguishing factor of Schuman. There, the contract was also a contract to become a preferred vendor, rather than a contract for specific services, so any issues of "continuing functions" in Schuman would be analogous to any issues here. Moreover, later Schuman discusses this argument in more detail in a way that is directly applicable to this case:

> The contract language here unambiguously requires Defendant to pay Plaintiff commissions on any outstanding McKesson sales but does not require Defendant to pay Plaintiff commissions on sales not yet made. Moreover, Plaintiff even acknowledged in deposition that a commission was not earned until the sales agreement was approved and executed, the equipment was installed, and the customer was invoiced. Schuman Depo. at 327:2-12. As discussed supra, the McKesson National Contract did not involve any orders for specific supplies or services, but merely locked IKON into a pricing scheme that was beneficial to McKesson and that put IKON in the advantageous position of serving as McKesson's preferred office supplies and services vendor. It would be up to IKON's sales representatives to realize and maximize the sales opportunity. Albrecht Depo. at 72:12-17. Accordingly, the contract was not itself a sale and never itself generated any revenue; the contract merely gave IKON permission to try to make sales which would then generate revenue. Plaintiff made no sales under the national agreement and he has provided no evidence that he was denied commissions on McKesson sales he initiated that had been invoiced but not yet paid in violation of the

9

> compensation plan, nor does he provide any evidence that the plan provision would require IKON to pay Plaintiff commissions for future sales he did not make.

2005 U.S. Dist. LEXIS 10039, at *25-26. This is analogous to the situation here: (1) Plaintiff's compensation plan contract also does not require Defendant to pay Plaintiff commissions on sales not yet already made; (2) a commission was not earned until a sales contract was signed, services were delivered, and the customer was invoiced; (3) the customer contract did not involve any orders for specific services but merely locked Defendant into a pricing scheme that was beneficial for Intel and that put Defendant in the advantageous position of serving as an Intel approved vendor; (4) it would be up to Defendant's sales representatives to maximize sales opportunities; (5) the contract was not itself a sale, and never generated any revenue; (6) Plaintiff made no sales under the contract; and (7) Plaintiff not denied any earned commissions. Just as in Schuman, this demonstrates that there was no breach of contract here.

Defendant argues additionally that because Plaintiff was an at-will employee, it had the right to modify the terms and conditions of Plaintiff's employment without being in breach of the employment contract. Plaintiff acknowledged his employment was at-will in his offer letter and each Compensation Plan he signed. Remus Depo. at 19:6-8, Exs. 1-2, 4-6. California courts have held that an employer may make unilateral changes to the terms of employment, including compensation, when the employee is at-will. See Singh v. Southland Stone, USA, Inc., 186 Cal. App. 4th 338, 356 (2010), citing Schachter v. Citigroup, Inc., 47 Cal. 4th 610, 620 (2009); DiGiacinto v. Ameriko-Omserv Corp., 59 Cal. App. 4th 629, 637 (1997). "The at-will presumption authorizing an employer to discharge or demote an employee similarly and necessarily authorizes an employer to unilaterally alter the terms of employment." Schacter, 47 Cal. 4th at 620. Thus, Defendant argues that the prospective changes to Plaintiff's compensation cannot be a breach of contract since employers have the right to make such changes to terms of employment of at-will employees.

Plaintiff argues Schacter is distinguishable because there the compensation plan specifically provided for a forfeiture of certain compensation benefits if the employee chose to leave employment. It is not clear how this is relevant. Moreover, Plaintiff points out that

the Schacter court noted that "it has long been the rule that termination (whether voluntary or involuntary) does not necessarily impede an employee's right to receive a commission where no other action is required on the part of the employee to complete the sale leading to the commission payment." Id. at 622 (emphasis added). Here, as discussed above, the contract with Intel was not a contract for any specific sales, but rather to become an approved vendor. Thus, it was not a contract where all steps for a sale had been completed. Rather, for a specific sale a whole new process would be initiated by Intel on a project basis. Therefore, the general statement in Schacter does not support Plaintiff's position in this case.

Finally, the facts of DiGiacinto are also illustrative. Prior to the beginning of his employment, the employee in DiGiacinto signed an offer letter setting forth the terms and conditions of his employment, which included a specified rate of compensation. Six months later the employee was notified that his pay rate would be reduced and, unlike Plaintiff, the employee demanded that his wages not be reduced and refused to sign any document acknowledging the reduction in his pay rate, but continued to work for his employer. A year later, the employee filed a complaint for breach of contract seeking to recover the difference in his pay between his original pay rate and his reduced pay rate. Like Plaintiff, DiGiacinto alleged that his employer "unilaterally and without consideration modified the specific terms of the written employment contract . . . by instituting a second written employment contract . . . ." DiGiacinto, 59 Cal. App. 4th at 632.

The issue presented in DiGiacinto was "whether the employer of an at-will employee is liable for breach of contract when the employer notifies the employee of a prospective change in his rate of compensation and thereafter the employee continues in employment." Id. at 631. In concluding that an employer is not so liable, the court noted, "the majority line of cases supports the proposition that as a matter of law, an at-will employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions." Id. at 637. Here, Plaintiff admittedly was given notice of the change in the commission structure by Mr. Terry. In fact, Plaintiff signed off on the July-December 2010 Plan, and continued to work for Defendant until his termination nearly five months later. Remus Depo. at 40:9-11, Ex. 6.

11

Thus, under the reasoning of DiGiancinto, Defendant is not liable for breaching an employment contract between itself and Plaintiff.

Plaintiff argues the situation is different here because the change in the Compensation Plan was not really prospective, as he had completed all required actions to receive commissions on the Intel contract. This, again, ignores the fact that the contract was not actually a sales contract, but simply a contract to become an approved vendor. While Defendant's removal of Plaintiff from the account did not show appreciation for Plaintiff's work in securing the contract to become an approved vendor, given the actual language of the Compensation Plan, the way commissions were paid, and Plaintiff's status as an at-will employee, Defendant did not breach the employment contract or the Compensation Plan by removing Plaintiff from the account and reducing his commission rate. Thus, the Court grants summary judgment on this claim.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that "the acts of defendant, and each of them, constituted a breach of the covenant of good faith and fair dealing included in plaintiff's employment contract." Compl. ¶ 8. Every contract contains an implied covenant of good faith and fair dealing which guarantees that "neither party will take any action extraneous to the defined relationship between them that would frustrate the other from enjoying benefits under the agreement to which the other is entitled.." Kuhn v. Dept. of Gen. Servs., 22 Cal. App. 4th 1627, 1638 (1994). Still, the covenant of good faith and fair dealing "cannot be used to imply an obligation which would completely obliterate a right expressly provided by a written contract." Tollefson v. Roman Catholic Bishop, 219 Cal. App. 3d 843, 853-854 (1990) (disproved on other grounds in Scott v. Pacific Gas & Electric Co., 11 Cal. 4th 454, 474 n.5 (1995)). "We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms." Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 374 (1992) (emphasis added).

12

Defendants argue that modifying Plaintiff's Compensation Plan in July of 2010 cannot be a breach of the implied covenant of good faith and fair dealing because the 2010 Plan expressly permits the Defendant to change, modify and/or amend the terms of the Plan. Thus, to imply an obligation not to change commission rates for future projects is to interject an obligation contrary to the express language of the Plan. This is prohibited by law, and thus, Plaintiff cannot demonstrate a genuine issue of material fact that Defendant breached the implied covenant of good faith and fair dealing.

Plaintiff argues in response that Defendant mischaracterizes his argument. Plaintiff states he is not attempting to imply an obligation to not change commission rates for future projects, which he concedes would be directly contrary to his written contract. Instead, Plaintiff argues that Defendant in fact changed a commission after his essential duties had been completed, frustrating his legitimate expectations that he would be compensated for work accomplished in accordance with the agreement in force when the work was done. Essentially, Plaintiff is arguing that he had completed all his needed actions prior to the change in the plan, and thus, he should receive the fruits of that work (securing the Intel contract) at the rate stated under that plan. Opp'n at 6. He argues the change was not actually prospective, and thus, the above law does not apply to block his claim.

The problem with this argument is that the modification to the Plan, as even Plaintiff acknowledges, "only took away prospective commissions." Id. The Intel contract was not for any specific services. The signing of that contract did not lead to sending an invoice to Intel – the action that triggered payment of commissions under the Compensation Plan. To read the Compensation Plan as implying that the covenant of good faith and fair dealing prevented Defendant from "t[aking] away prospective commissions" is in direct conflict with the stated language of the Compensation Plan.[3] Accordingly, the Court finds that there is not

---

[3] Plaintiff also attempts to distinguish Tollefson on the ground that implying a duty of good faith and fair dealing here would not "obliterate" the agreement. In Tollefson, the court found that a teacher who had a number of successive one year contracts could not claim a duty to renew the contract on the basis of the covenant of good faith and fair dealing because the contract was silent as to renewal. Thus, imposing such a duty to renew would be contrary to the language of the contract. 219 Cal. App. 3d at 853-54.

Plaintiff states that implying a duty not to change the Intel commission rate would not

13

a genuine issue of material fact as to the issue that Defendant did not violate the covenant of good faith and fair dealing, and grants Defendant's motion as to this claim.

### C. Wrongful Termination in Violation of Public Policy

In his second cause of action, Plaintiff alleges that the "primary motivation for terminating plaintiff's employment was to prevent [Plaintiff] from receiving any commission from the Intel contract to which he was entitled as well as retaliation due to his complaining concerning the compensation decisions made by the defendant." Compl. ¶ 10. Thus, Plaintiff bases his claim upon two grounds: (1) the prevention of Plaintiff from receiving commissions, and (2) retaliation based on Plaintiff's complaints concerning Defendant's compensation decisions. Defendant argues the first ground fails as a matter of law, and that Plaintiff cannot meet the requirements for demonstrating a claim of retaliation as a matter of law as well. The Court will address each in turn.

#### 1. Prevention of Receipt of Commissions

There is no dispute that Plaintiff was paid all commissions earned at the time of his termination. Remus Depo. at 40:5-8, 100:22-101:2. The following exchange occurred at Plaintiff's deposition: "Q: You said that you believe you were terminated by the company in order to avoid having to pay you any revenue on the Intel account. My question is: That revenue that you're referring to, is that commissions or revenue that you had earned at the time of your termination? A: No." Id. at 99:18-24. Thus, Plaintiff conceded that Defendant did not avoid paying him earned commissions on the Intel account, or any other account, by terminating him.

Plaintiff complains instead of being deprived of commissions based on anticipated but uncommitted future business from Intel – essentially future commissions that were unearned at the time of termination. "California public policy does not prohibit termination of employees in order to avoid paying future wages not yet earned. Thus, plaintiff's allegation that defendant terminated his employment in order to avoid paying any future

---

"obliterate" the agreement allowing Defendant to change the terms of the contract as prohibited by Tollefson. Rather, Plaintiff argues the covenant simply requires that such action be done fairly and prospectively when he had completed his duties with respect to earning the commission. As Plaintiff admits the change was to "prospective commissions," the argument is unavailing.

14

wages or compensation due fails to state a claim for wrongful termination in violation of public policy." Sinclair v. ServiceMaster Co., No. 07-0611, 2007 U.S. Dist. LEXIS 56623, at *11 (E.D. Cal. Aug. 2, 2007). Thus, Plaintiff's claim fails as a matter of law.[4]

### 2. Retaliation For Complaints

An employee establishes a claim for wrongful termination in violation of public policy if he proves that the employer "violated a policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision." Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1256 (1994). In determining whether Plaintiff can establish a claim for retaliation, or wrongful termination, California courts apply the formula set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Thus, in order to establish a prima facie case supporting a retaliation claim, a plaintiff must show: (1) that he engaged in a protected activity; (2) the employer subjected him to an adverse employment action, and (3) a causal link between the protected activity and the employer's action. Akers v. Cnty. of San Diego, 95 Cal. App. 4th 1441, 1453 (2002).

Defendant argues that Plaintiff fails to demonstrate he engaged in a protected activity, and thus, fails to establish a prima facie case supporting retaliation. Plaintiff argues his complaint regarding his change in compensation from removal of the Intel account was a protected activity.

Plaintiff testified that the first complaint he raised was on July 6, 2010 when he first learned he would be removed from the Intel account. Remus Depo. at 75:8-14. Plaintiff clarified that he "didn't really complain about the change of commission at all. I complained that they were taking away the account. . . . There was no complaint about the change in commission. There was a complaint about them taking the account away." Remus Depo. 75:15-76:3. While Plaintiff and Mr. Terry spoke again on two occasions between July and

---

[4] Plaintiff relies upon Gould v. Maryland Sound Indus., 31 Cal. App. 4th 1137, 1148 (1995) to support his argument that his termination violates public policy. Defendant points out that Gould is distinguishable, because it deals with an employee's right to receive commissions, vacation pay, and other amount that the employee had earned at the time of termination. Gould, 31 Cal. App. 4th at 1147. Plaintiff argues "this position overlooks the fact that when revenue was received a commission would be owing and that Mr. Remus had objected to the removal of the account." Opp'n at 4. This concedes that there was not a commission owed at the time of termination, and thus, Gould is inapplicable.

15

early September, Plaintiff confirmed that in neither conversation did he raise any complaints about his commissions or the Intel account being taken away. Remus Depo. at 77:5-11; 81:1-23.

On September 14, 2010, Plaintiff responded to an email from Mr. Terry where Mr. Terry expressed his concerns over Plaintiff's performance. Remus Depo. Ex. 9. In his September 14th email, Plaintiff complained that the Intel account was taken away resulting in his loss of future, unearned commissions. Remus Depo. at 89:10-91:7. This email was the last interaction Plaintiff had with Mr. Terry until his termination on October 5, 2010. Remus Depo. at 82:9-15; 84:10-13. At no point from July 2010 through the end of his employment, did Plaintiff raise complaints to any other employee of Defendant about either Defendant's decisions to remove him from the Intel account, or to change his commission structure. Remus Depo. at 82:16-83:3.

Plaintiff's reliance on Gould and Phillips v. Gemini Moving Specialists, 63 Cal. App. 4th 563 (1998), to demonstrate a fundamental public policy protecting his activity is unavailing. Those cases support the general proposition that the prompt payment of wages due is a fundamental public policy. See Gould, 31 Cal. App. 4th at 1147 (stating an employer violated fundamental public policy of the state if it terminated plaintiff to avoid paying him commission, vacation pay, and other amount he had earned); Phillips, 63 Cal. App. 4th at 571 ("[T]he prompt payment of wages due an employee is a fundamental public policy of this state.") (emphasis added). Here, as discussed above, Plaintiff's complaints were related to his failure to receive future, unearned commissions, rather than any commissions earned and due to him at his time of termination. See Remus Depo. at 89:20-91:12, 99:18-24. Plaintiff points to no legal authority that would support his claim that complaining about future modification to his work assignment or the loss of future wages constitutes protected activity, nor has the Court found any. There is no statute or constitutional provision that deems complaints about changes to prospective, unearned waves to be protected activity. A claim for wrongful termination in violation of public policy is limited to "those claims finding support in an important public policy based on a statutory or constitutional provision." Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 79 (1998). Thus, the

Court finds Plaintiff failed to demonstrate he engaged in a protected activity, and thus, fails to raise a genuine issue of material fact as to whether he was terminated in violation of public policy. Given this conclusion, it is not necessary to examine the remaining McDonnell Douglas factors. Accordingly, the Court grants Defendant's motion for summary judgment on this claim.

### IV. CONCLUSION

For the forgoing reasons, the Court GRANTS Defendant's motion for summary judgment in its entirety.

**IT IS SO ORDERED.**

Dated: March 5, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE